UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIG GUY'S PINBALL, LLC

      Plaintiff,

      v.

JIMMY LIPHAM,

      Defendant.

Case No. 2:14-CV-14185-VAR-RSW

Honorable VICTORIA A. ROBERTS
U.S. District Judge, Presiding

Honorable R. STEVEN WHALEN
U.S. Magistrate Judge, Referral

Robert A. Farr, Jr.
ROBERT A. FARR PLLC
Attorney for Plaintiff
1050 Shiawassee Circle
Howell, MI 48843
248-703-0662
Email: rfarr@rfarrlaw.com

Eric C. Grimm (P58990)
ERIC C. GRIMM, PLLC
Attorney for Defendant
P.O. Box 41
Muskegon, MI 49443-0041
734.717.4900
Email: ecgrimm@umich.edu

## <u>DEFENDANT'S FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSES</u>

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 15(a)(1)(A), Defendant, Jimmy Lipham, by undersigned counsel, respectfully states for his first amended answer and affirmative defenses:

1.     Admitted that Big Guys Pinball, LLC ("BGP"), is a Michigan LLC with its principal place of business in Michigan.

2.     Admitted that Jimmy Lipham resides solely in Georgia. On the date of this Answer, the Internet domain name playpinbox.com, according to "whois" records, is not registered to anybody.

3.     The allegations in Paragraph 3 seek to characterize the action, and no response is required. To the extent that a response is required, the allegations are denied as untrue. This **<u>is</u>** an action about a copyrighted work of authorship (a computer program) – but it is **<u>really</u>** about a

copyrighted work called QEMU.  The QEMU Website states:

> QEMU is a generic and open source machine emulator and virtualizer.
>
> When used as a machine emulator, QEMU can run OSes and programs made for one machine (e.g. an ARM board) on a different machine (e.g. your own PC). By using dynamic translation, it achieves very good performance.
>
> When used as a virtualizer, QEMU achieves near native performances by executing the guest code directly on the host CPU. QEMU supports virtualization when executing under the Xen hypervisor or using the KVM kernel module in Linux. When using KVM, QEMU can virtualize x86, server and embedded PowerPC, and S390 guests.

A recent press release on the Software Freedom Conservancy website states:

> Bradley M. Kuhn, Conservancy's President and Distinguished Technologist, commented "QEMU is an essential piece of operating system infrastructure, as well as the testing ground for virtualization code.  Many of the most famous Free Software projects, including Linux and OpenStack, would not be where they are today without the tireless and detailed virtualization work done by the QEMU developers.  I am delighted for QEMU to join Conservancy, so that Conservancy can assist the QEMU developers to continue their excellent work in the public good."

QEMU is Free Software.  Free Software (a/k/a Software Libre) is **not the same as the public domain**, but instead depends on copyright law and on well-understood principles of copyright licensing, to establish enforceable rules of reciprocity and to enforce community norms.

Free Software is entirely **consistent** with copyright law, and the policies that inform copyright law (namely, promoting the "progress of science and useful arts," U.S. CONST. Art. I, § 8, cl. 8).

Indeed, many legal scholars, including but not limited to Lawrence Lessig, James Boyle, Mark Lemley, Pamela Samuelson, Eben Moglen, and others, have made the case that "Free Culture" licensing principles – which are inspired by Free Software, but apply to many different kinds of copyrighted works – as well as "Free Software" principles, are inherently better at driving innovation than many more traditional copyright license approaches.

For instance, we recommend the following TED talk by Professor Lessig: < http://www.ted.com/talks/larry_lessig_says_the_law_is_strangling_creativity?language=en > (Lawrence Lessig, *Laws that choke creativity*, TED 2007), which makes the case quite well.

The word "free" in Free Software, is **not about price**; it refers instead to the **freedom or liberty** of the end-user – it is about human rights, not price.  Richard Stallman, the Founder and President of the Free Software Foundation ( https://www.fsf.org/about/ ) ("FSF," which is distinct from SFC), according to the FSF.org Website, "founded the free software movement in 1983 when he announced he would develop the GNU operating system, a Unix-like operating system meant to consist entirely of [F]ree [S]oftware.  He has been the GNU project's leader ever since.  In October 1985 he started the Free Software Foundation."  GNU is a recursive acronym, that stands for GNU's Not Unix."  Stallman has made a large number of public appearances and has written extensively about the intent of Free Software, and of Free Software licenses generally, including but not limited

to the GNU General Public License v.2.0 ("GPL"). This honorable court can take judicial notice of the intent of these licenses as stated by the person who is responsible for them – namely, to protect the _freedom_ of the _entire community_ of end-users. Thus, the broad scope of the intended universe of third-party beneficiaries of these licenses, is apparent on the face of the licenses themselves, and is a fair matter for judicial notice. For instance, but without limitation, Mr. Stallman in the following TED Talk – which is presented in an easy-to understand format for non-technical audiences – points out that in a future in which computers play an increasingly large role in the lives of every human being, Free Software is a human right at least as important to all of us as the importance of the human rights of free speech, a free press, freedom of assembly, and freedom of religion,  in  human  affairs  for  the  past  several  centuries.  < http://tedxtalks.ted.com/video/Free-software-free-society-Rich > (Richard Stallman, _Free Software, Free Society_: _Richard Stallman at TEDx Geneva 2014_, July 7, 2014). In short, this is an important issue requiring careful attention.

In order to promote the freedom of end-users, a license such as the GPL or the LGPL, must specifically protect four freedoms of every end-user (the licenses specifically use the term "you" to mean **anyone** that uses, copies, or modifies the program). See GNU General Public License v.2.0, Pmbl. (emphasis added) ("The licenses for most software are designed to take away your freedom to share and change it. By contrast, the GNU General Public License is intended to guarantee your freedom to share and change free software – to make sure the software is free for **all** its users. This General Public License applies to most of the Free Software Foundation's software and to any other program whose authors commit to using it. . . .  You can apply it to your programs, too."), < http://www.gnu.org/licenses/old-licenses/gpl-2.0.en.html >.  It is obvious on the face of the document (as well as the LGPL license, < http://www.gnu.org/licenses/lgpl-3.0.en.html >), that

every single end-user and the entire community of contributors and users, is expressly intended to be among the beneficiaries of the terms of each license, and both subject to, and beneficiary of all the obligations each such license establishes for anybody who prepares any work based on each such program.  This is reinforced all the more by public statements from NYU Professor Eben Moglen, who served as General Counsel for the FSF for many years.  For instance, here is Professor Moglen addressing the European Parliament: < https://www.youtube.com/watch?v=FI1CoeqyD5o >.

In a typical Free Software project, a "maintainer" of the project (in the case of QEMU, that would be Fabrice Bellard) coordinates the work of a distributed team of authors (known as "contributors"), who work together collaboratively to produce high-quality computer code.  The "source code" of a computer program is human-readable and editable, especially compared with "object code" or "executable" which is distilled from the source code by running the source code through a kind of program called a "compiler."  The "object code" is intended to be executable, and suitable for execution, by computer hardware.  It is difficult for human beings to read object code, after it is compiled.  Access to the source code makes it much easier for human beings to understand the inner workings of a program, and to work together to make the software better.  This is why one of the four freedoms required for Free Software (Freedom 1: "The freedom to study how the program works, and change it so it does your computing as you wish. Access to the source code is a precondition for this. "), requires access to human-readable source code.

The "maintainer" is typically one of the authors of the program, but not the only author. Some works, such as the Linux kernel, have thousands of contributors, who have submitted code for inclusion in the finished source code.  For example, Linus Torvalds has for years been the lead "maintainer" of the Linux kernel, but when the Software Freedom Conservancy initiated litigation against a company called VMWare (a leading commercial provider of "virtualization" software,

which is a function that QEMU can sometimes play, too), the Conservancy announced that Christoph Hellwig – who had played an especially active role in writing and authoring the parts of the Linux Kernel that VMWare allegedly infringed – would serve as lead plaintiff. Torvalds, in short, is not the only copyright owner, when the Linux kernel is concerned. And the rights of the whole community in and to the Linux kernel and all derivatives of it, cannot in any way depend on Torvalds as a holdout or essential participant, or give him a veto over actions by other community participants. Likewise, with respect to QEMU, the express intention of anybody adopting the GPL or the LGPL (Fabrice Bellard and the contributors to QEMU did not write this license — the FSF, led by Moglen and Stallman, did) – is to participate in a creative ecosystem, governed by the rules written into the standard FSF licenses, to receive the benefits of access to the community – say, Free software access to the GCC compiler and the Linux kernel, among many other benefits, by intentionally making the entire community intended beneficiaries of all contributions to QEMU. Thus the meaning and intention of Bellard and other contributors releasing code under the GPL or LGPL license, is easily understood precisely because these licenses are standard and apply to thousands of programs within the ecosystem of the Free Software community.

On July 23, 2015 (a few days before the prior Answer was filed), the Software Freedom Conservancy ("SFC") announced that it now serves as home for the QEMU project. See < http://sfconservancy.org/news/2015/jul/23/qemu-joins/ >. This means that an agreement similar to the standard SFC Fiscal Sponsorship Agreement, < https://sfconservancy.org/members/apply/ConservancyFSATemplate.pdf >, is in place between participants in the QEMU project (maintainer and contributors), and SFC undertakes representation of various aspects of the project's interests. This arrangement can sometimes incluide assignment of the copyrights to SFC, see < https://sfconservancy.org/members/services/ >, or the QEMU

trademark, but such assignments are not required as a precondition of a SFC Fiscal Sponsorship Agreement.  Under the relationship established with the SFC, decision-making about the QEMU project is in the future to be done by a steering committee, selected by the contributors to the QEMU project.  It remains to be seen what rights, if any, the SFC will itself hold on behalf of the QEMU project / community.  However, SFC appears to be the vehicle through which the QEMU Steering Committee, and hence the authors of the work, will interact with others, for licensing and enforcement purposes, among other functions.

BGP categorically does not own the copyright to QEMU, and has no exclusive rights whatsoever to QEMU.  Fabrice Bellard, the maintainer of QEMU, has not granted any license to the plaintiff, for QEMU, other than the Free Software licenses that apply to the LGPL.  Nor, to defendant's knowledge, has anyone else with any licensing authority relating to QEMU.

This also means that – due to the "give back" conditions that courts already have uniformly enforced in multiple cases under Free Software licenses, BGP categorically has no right to exclude anyone from any derivative works based on QEMU, unless – under the terms of the GNU General Public License, version 2, and/or the LGPL, version 3 – BGP refrains totally from copying or distributing said derivative work(s) to any third-parties.  Under Section 106 of the Copyright Act (Title 17), the authors of QEMU (or the SFC, if it becomes assignee) enjoy the following **exclusive** rights granted by Congress (emphasis added): "(1) to reproduce the copyrighted work in copies or phonorecords; (2) **to prepare derivative works based upon the copyrighted work**; [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  Through the GPL and LGPL, the entire community is intended to benefit from the conditions required of BGP, not to be excluded from the authors' rights.  Those conditions include making the source code publicly available (not just to the authors of

QEMU, but to the whole community), and releasing "works based on the program," under the same license as QEMU.  BGP has not fulfilled these mandatory conditions, and therefore the Free Software Licenses automatically and categorically exclude BGP from making or distributing its derivative work of QEMU, unless and until it fulfills its obligations to the whole community (including Mr. Lipham).

QEMU is intentionally subject to (and this is undisputed) a **copyright license** (for the most current version of QEMU, this is called the GNU General Public License, version 2), that – subject to specified mandatory preconditions – allows others (including BGP) to make some copies and derivative works.  But if a derivative work is prepared and distributed in a way inconsistent with those mandatory preconditions, then it is a violation of the Copyright Act  (and of copyright laws in nearly every country), for BGP to copy or distribute the infringing derivative work.

BGB did not create any pinball emulator "from scratch," or as any original work of authorship.  (Note: Section 102 of the Copyright Act specifically states that the subject-matter of copyright, pertains to **original** works, which "Nucore" emphatically is not: "Copyright protection subsists, in accordance with this title, in **original** works of authorship fixed in any tangible medium of expression . . . .").  It would have taken tens of thousands of person-hours, for BGP to perform the monumental task of writing an emulator "from scratch."   Instead, what BGP did was to appropriate the intellectual property of the QEMU community, by preparing an emulator derivative of QEMU and recycling QEMU code, by violating the QEMU copyright, and then attempting to profit off the efforts of the maintainer, contributors, and community of QEMU and Free Software.

The infringing nature of the BGP infringing derivative work, already has been analyzed extensively by persons who are active in the QEMU community:

https://lists.gnu.org/archive/html/qemu-devel/2014-11/msg00096.html

https://lists.gnu.org/archive/html/qemu-discuss/2014-11/msg00003.html

https://pinside.com/pinball/forum/topic/nucore?tu=deefunkt

http://qemu.11.n7.nabble.com/template/NamlServlet.jtp?macro=user_nodes&user=1660

What BGP did was to make some minor modifications of the QEMU source code (i.e., a derivative work based on QEMU), and then to copy, sell, and distribute that infringing derivative work in violation of the Copyright Act.  BGP also violated the law by removing the copyright notices and credits from QEMU, and attempting (in violation of Section 1125 of the Lanhan Trademark Act, among other laws) to pass off the infringing derivative work ("Nucore" will be referenced herein as "IDW" meaning Infringing Derivative Work) as BGP's computer program, rather than an infringing derivative of QEMU.  Indeed, the Big Guys Pinball Website has several videos from 2008, featuring a computer whose proprietary operating system has been replaced with the Linux® kernel, and a distribution of the related GNU/Linux operating system, that helps confirm the real provenance of the IDW.  See < http://www.bigguyspinball.com/meda.shtml >.  Notably, BGP on June 2, 2015 (i.e., long after this lawsuit was filed, and after much of the briefing was done on motions to dismiss), backhandedly acknowledged the huge debt it owed to the Free Software community: "Nucore contains some components which are free source code . . . . If you would like a copy of the free software components of Nucore, please provide the detail below and remit with a $35 money order

payment to cover the cost of an optical CD containing that code, plus packaging, postage, and handling fees, and the materials will be mailed to you via USPS."  This belated "revision" by BGP suffers from two flaws.  First of all, instead of filing a "dec action" in federal court, seeking a neutral and objective analysis of whether any "components" or "side-files" of the IDW (other than the Williams ROMs, which both BGP and Defendant agree are proprietary solely to Williams), BGP

improperly appointed itself judge of what is or is not legal.  If BGP itself is guilty of illegal "self-help" in this way, then BGP lacks any equitable basis to complain of self-help by anyone in the Free Software community – including but not limited to Jimmy Lipham.   Second, even assuming for the sake of argument (and we have no reason to believe this is right), that BGP actually analyzed its copyright and licensing obligations correctly and reached the identical result that a federal judge would have reached in a properly-filed "dec action" prior to BGP distributing the IDW illegally, still the procedure that BGP has adopted starting in June, 2015 (thereby acknowledging that BGP was doing it wrong the whole time prior to 2015), does not conform to the requiremens of the GPL v2 or the LGPL v.3.  BGP admits it has an obligation to distribute <u>something</u> involving Free Software because of Copyright Act and licensing requirements – but even the part that BGP admits it must distribute, is not being done in a way that fulfills the legal requirements for distributing such derivatives of Free Software copyrighted works.

4.     Complete diversity exists; also federal courts have exclusive jurisdiction of copyright cases, which cannot be filed in state court.

5.     Subject-matter jurisdiction is uncontested.

6.     The allegations in paragraph 6 are categorically denied as untrue.   Unlike the magazine in <u>Calder v. Jones</u>, which sold 10,000 copies of its publication in California (<u>i.e.</u>, doing business in a "continuous and systematic manner" in California), the Defendant in this case has conducted <u>absolutely no activity whatsoever</u>, at any time, in the state of Michigan, and never has purposefully availed himself, ever, of Michigan or of any benefits or protections of its laws.  <u>See also</u> <u>Spacey v. Burgar</u>, 207 F. Supp. 2d 1037 (C.D. Cal. 2002) (Feess, J.) (correctly analyzing due process issues, rather than merely supposing that mere allegation of "harm" to a plaintiff in forum state, automatically manufactures personal jurisdiction).  The mere presence of the <u>Plaintiff</u> in

2:14-cv-14185-VAR-RSW   Doc # 44   Filed 08/13/15   Pg 11 of 20   Pg ID 521

Michigan, has nothing to do with the Defendant, and is categorically insufficient to satisfy due process requirements. And all BGP has is the Plaintiff's conclusory <u>allegation</u> (which is also false) that the Plaintiff somehow allegedly "felt injury" to Plaintiff's willful and illegal infringement scheme of violating both the copyright and the license for QEMU. In this case, Jimmy Lipham's Rule 12(b)(2) motion was properly supported with an evidentiary <u>affidavit</u>, showing a complete absence of jurisdictional contacts with Michigan. The rule in the Sixth Circuit is not that jurisdiction can be based on mere allegations in the pleadings. Rather, as stated in <u>See, Inc. v. Imago Eyewear Pty.</u>, Ltd., 167 Fed. App'x 518, 520-21 (6th Cir. 2006) (emphasis added) (affirming decision of Hood, J., dismissing for lack of personal jurisdiction), "[I]n the face of a properly supported motion for dismissal, the plaintiff **may not stand on his pleadings** but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." (Quoting <u>Theunissen v. Matthews</u>, 935 F.2d 1454, 1458 (6th Cir. 1991). <u>See also</u> <u>Means v. United States Conference of Catholic Bishops</u>, 2015 WL 3970046, at *4 (W. D. Mich. June 30, 2015) (declining to exercise personal jurisdiction, despite undeniably serious physical harm suffered in Michigan, by Michigan-located plaintiff, which harm to a whole category of persons directly impacted by policy, must necessarily have been foreseeable to, and indeed intended by, the defendants) (citing the evidence-not-allegations rule from <u>See</u>).

7.      Denied. Supplemental jurisdiction does not exist, and the state-law causes of action are completely pre-empted by the Copyright Act.

8.      Denied. BGP has no "property" either in QEMU or in any IDW of QEMU. There is no "property" in Michigan, and no activity whatsoever by the Defendant (as opposed to willful infringement by the Plaintiff only) occurred anywhere near Michigan. The allegations are totally false.

Page 11 of 20

9.     Denied as untrue. The Copyright Office merely provides a registration mechanism, and does not adjudicate questions of ownership or infringement. The IDW is not an original work of authorship, and instead is an illegal and infringing derivative of QEMU. BGP already admits that at least part of the IDW is infringing, and has been since 2008, so the only thing to adjudicate (which BGP could have done in advance, but did not), is how much of the IDW infringes both the Copyright Act and Free Software licenses. Defendant respectfully asserts that, if this honorable Court is going to adopt BGP's position that "self-help" should be discouraged, somehow, and that the filing of declaratory judgment actions in federal court ought to required as a prerequisite for distributing potentially infringing works to third parties – in lieu of so-called "self help" – then that new "dec action" rule (which would be completely novel and never has previously been articulated by any federal court to our knowledge – only by BGP), ought to be **applied even-handedly** both to BGP and to Lipham. BGP does not get to appoint itself judge of whether the IDW is infringing or not, or (more precisely) what parts are infringing and which are not. BGP easily could have filed a "dec action" in federal court, seeking a ruling that parts or "components" of the IDW purportedly do not infringe QEMU (thus, separating the sheep from the goats, so to speak), and that BGP purportedly has exclusive rights to parts of the IDW, independent of the QEMU maintainer, contributors, and community. (BGP kindly has conceded that some parts of the IDW are "Free Software" and that BGP has been infringing the copyrights on what BGP also concedes are the Free Software "components" of the IDW, at least from 2008 to June, 2015). Obviously, BGP did not file the "dec action" that BGP would (without fair notice to Defendant that any such rule exists, and without precedent), retroactively require of Defendant. BGP attaches no such certified judgment of any court. BGP ought not to be allowed by this honorable Court, to usurp the authority of the federal courts, and to appoint itself judge in its own case as to which "components" of the IDW are

infringing of the Copyright Act and Free software licenses, and which are not. Accordingly, the allegations by BGP in Paragraph 9 are categorically insufficient to state any claim upon which relief can be granted, unless BGP itself has fulfilled what BGP proposes ought to be the precondition of securing a declaratory judgment as to what rights are exclusive and which are not, prior to distributing anything to any third party. Sauce for the goose, is good for the gander, so to speak.

10.    Denied as false. When BGP began distributing the IDW to third parties, it automatically granted an equitable implied license to everyone, under the terms of the GPL and/or the LGPL, to redistribute the same in as much compliance with those licenses as could reasonbly be achieved (i.e., BGP was the stumbling block to providing the full source code as required, and the community should not be punished or deprived of software that is required by law to be Free, due to the infringer's (BGP's) intransigence).

11.    Admitted that the IDW is an emulator of the computer hardware contained in Williams pinball machines, and is a derivative work of QEMU, which was prepared without permission of the owners of the QEMU copyright. Except as expressly admitted herein, the Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

12.    Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial. On information and belief, the license from Williams, if any, is *not* exclusive, and Williams has other licensees of these works.

13.    Denied as untrue that the copying or distribution of the IDW to any third-parties by BGP ever was lawful. Otherwise, Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

14.    Defendant lacks sufficient knowledge or information to form a belief about the truth

or untruth of the allegations, which is the same as a denial.

15.     Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

16.     Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

17.     Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

18.     Defendant believes that he has been identified by Comcast as being assigned this IP address at this time.

19.     Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

20.     Defendant was assigned that IP address at the time (ownership of IP addresses is addressed by ARIN, and Defendant did not own the IP address – it was merely dynamically assigned by Comcast, using well-understood Internet protocols, which protocols all over the Internet are typically mediated by Free Software), and Defendant posted the announcement to the Internet pinball forum Pinside.com.  Except as expressly admitted herein, the Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

21.     No response required.  Except as expressly admitted herein, the Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

22.     The same message that was posted to pinside also was posted by Defendant to the Internet newsgroup rec.games.pinball.  At the time, Defendant owned the domain playpinbox.com

and the email address support@playpinbox.com (although the registration for the domain name has subsequently lapsed).   Except as expressly admitted herein, the Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

23.    Denied as untrue that there was any infringement, except by the Plaintiff, or that there was any "time of the infringement."   Otherwise, in or about August 1, 2013, Jimmy Lipham previously was the registrant of the internet domain name playpinbox.com.   There is nothing the least bit nefarious about the use of Domains by Proxy, which is a common and customary practice on the Internet.   Except as expressly stated herein, Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

24.    Denied as untrue that there was any infringement, except by the Plaintiff.  Otherwise, Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

25.    Denied that Defendant has ever owned or registered the 3-letter domain name "PPB.com."  Admitted that in or about August, 2013 (i.e., prior to the filing of any registration papers by BGP with the Library of Congress on **January 31, 2014**), the Defendant was the registrant for the Internet domain name "playpinbox.com" – and that the domain name was used (as many domain names are) as a shorthand for the IP address of a webserver, used to publish a website. Otherwise, Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

26.    No response is required.  Except as expressly admitted herein, the Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations,

which is the same as a denial.

27.     The foregoing responses are repeated as if set forth verbatim herein.

28.     The only thing illegal that has occurred in this case is the infringement of the QEMU copyright, by BGP, when BGP failed to license the IDW under the GPL and/or LGPL, and failed to provide access to the complete source code of the IDW (or, at the very least, all Free "components" of the IDW) every time that BGP distributed a copy of the IDW to a third-party. Indeed, under Section 1201 of the Copyright Act, the Library of Congress has issued specific rules that authorize and approve the circumvention of anti-copying technologies in some circumstances. We respectfully note that <u>if</u> these rules do not permit what BGP claims should be forbidden, then BGP's own actions involving what amount to videogames are equally suspect.    Otherwise, Defendant lacks sufficient knowledge or information to form a belief about the truth or untruth of the allegations, which is the same as a denial.

29.     Denied as untrue.  The only infringer is BGP; and the only work infringed is QEMU.

30.     Denied as untrue.

31.     The foregoing responses are repeated as if set forth verbatim herein.

32.     Denied as untrue.

33.     Denied as untrue.  There is no "trade secret" and BGP is required by law to release the source code, in order to distribute the IDW to anybody.  If there are any "trade secrets" associated with Williams pinball machines, they belong to Williams, not to BGP, and any reverse engineering done by BGP to bypass Williams's protection of its own trade secrets, certainly does not make BGP the holder of any of Williams's trade secrets.

34.     Denied as untrue.

35.     The foregoing responses are repeated as if set forth verbatim herein.

36.     Denied as untrue.

37.     Denied as untrue.  Producing a proprietary emulator "from scratch" and not as a derivative of a Free Software emulator, would necessarily have been a money-losing business. While the GPL does not prohibit BGP from charging for distributing copies of the IDW, the terms of the GPL also necessarily mean that any customer of BGP (if BGP does not violate with Copyright Act with each and every copy) also would have the power to distribute the same thing free of charge. So if BGP were to distribute the IDW in a lawful (as opposed to the current infringing) manner, BGP would need to find a somewhat different sustainable business model in order to fulfill its obligations incurred as a result of utilizing the intellectual property of SFC, the QEMU maintainer, contributors, and community, rather than writing the BGP emulator "from scratch."

38.     Denied as untrue.

39.     Denied as untrue.

40.     Denied as untrue.

41.     Denied as untrue.

42.     Denied as untrue.

## AFFIRMATIVE DEFENSES

1.     BGP fails to state a claim upon which relief can be granted.

2.     BGP has no exclusive rights in the IDW because the IDW is not an original work of authorship.

3.     BGP has unclean hands.

4.     BGP has violated the copyright on QEMU, of which the IDW is an infringing derivative work.

5.     BGP has violated the copyright license that defines the conditions under which QEMU or

any work based on QEMU (including but not limited to the IDW), may be copied or distributed.

6.     Defendant's actions were privileged because the IDW on its face was and is an infringing derivative of QEMU, and Big Guys Pinball failed to follow its own proposed "declaratory judgment rule" by failing to seek a declaration from a federal court that limited "components" of the IDW somehow are not infringing of QEMU, prior to distributing the IDW illegally to third parties.

7.     Defendant is not subject to personal jurisdiction in this judicial district.

8.     Venue is not proper.

9.     The Defendant's activities are supported by the Copyright Act.

10.    The Defendant's activities are supported by the GNU General Public License, version 2, and/or the GNU Lesser General Public License, version 3.

11.    The Defendant's activities are supported by regulations issued under the Copyright Act.

12.    Some of the Defendant's alleged activities are entirely appropriate reverse engineering, authorized by law.

13.    Plaintiff's state-law claims are barred by total pre-emption under the Copyright Act.

14.    Plaintiff's claims are barred in whole or in part by estoppel, acquiescence, or *laches*.

15.    Plaintiff's claims are moot, because the Defendant is not copying or distributing any of the alleged software, has not done so since long prior to the Plaintiff's registration with the Copyright Office, and intends not to make or distribute copies of anything in the future.

17.    Plaintiff's claims are barred in whole or in part, because the lack of timely copyright registration by the Defendant precludes the Defendant from seeking most of the remedies that would normally be available under the Copyright Act.

## <u>JURY DEMAND</u>

Defendant respectfully demands a trial by jury as to all matters that may be so tried.

Respectfully submitted,

August 13, 2015                         s/ Eric C. Grimm (P58990)
                                       ERIC C. GRIMM, PLLC
                                       Attorney for Defendant
                                       P.O. Box 41
                                       Muskegon, MI 49443-0041
                                       734.717.4900
                                       Email: ecgrimm@umich.edu

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIG GUY'S PINBALL, LLC

    Plaintiff,

    v.

JIMMY LIPHAM,

    Defendant.

Case No. 2:14-CV-14185-VAR-RSW

Honorable VICTORIA A. ROBERTS
U.S. District Judge, Presiding

Honorable R. STEVEN WHALEN
U.S. Magistrate Judge, Referral

_____/

**CERTIFICATE OF SERVICE**

Eric Grimm (P58990), attorney for Defendant, certifies that on August 13, 2015, I filed the Defendant's First Amended Answer and Affirmative Defenses with the Court via the ECF system, which will provide notice and service of such documents upon all parties by their counsel of record.

ERIC C. GRIMM, PLLC

By: s/ Eric C. Grimm (P58990)
Attorney for Defendant
ERIC C. GRIMM, PLLC
Attorney for Defendant
P.O. Box 41
Muskegon, MI 49443-0041
734.717.4900
Email: ecgrimm@umich.edu