UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIG GUY'S PINBALL, LLC,

    Plaintiff,

v.

JIMMY LIPHAM,

    Defendant.

Case No. 2:14-CV-14185-VAR-RSW

Honorable VICTORIA A. ROBERTS
U.S. District Judge, Presiding

Honorable R. STEVEN WHALEN
U.S. Magistrate Judge, Referral

_____/

Robert A. Farr, Jr.
ROBERT A. FARR, PLLC
Attorney for Plaintiff
1050 Shiawassee Circle
Howell, MI 48843
248-703-0662
Email: rfarr@rfarrlaw.com

Eric C. Grimm (P58990)
ERIC C. GRIMM, PLLC
Attorney for Defendant
1330 West Summit Avenue
P.O. Box 41
Muskegon, MI 49443-0041
734.717.4900
Fax:  888.502.1291
Email: ecgrimm@umich.edu

_____/

## STATUS REPORT

    Now Comes Defendant, Jimmy Lipham, through counsel, and respectfully submits a status report, as directed by the Court.  An Amended Answer, clarifying several of the facts, also has been filed.  Both Mr. Lipham and legal counsel have been in communication with the Software Freedom Conservancy (which, it should be noted, is a different entity from the Free Software Foundation, as well as separate from the Software Freedom Law Center).

    During the last conference call with the Court, the Court suggested that it might be a good idea to enlist the services of an independent expert in Free Software and Free Culture licensing.  The Defendant supports this idea, and respectfully suggests that this should become the top priority in this case.  Not every lawyer who does copyright work, has expertise (or even familiarity) with principles of Free Software and Free Culture Licensing.  Indeed, only a small handful of lawyers

1

are widely recognized as having such expertise.  We do have a few suggestions, including lawyers and legal scholars who have actually written such licenses, to assist the court in selecting an expert who is suitably steeped in both the legal and technological issues that must be thoroughly understood in a case such as this one.

The second most important thing to accomplish is a code review, to ascertain whether Big Guys Pinball has <u>any</u> exclusive rights, to <u>any</u> aspect of the program BGP calls "Nucore."  BGP, on its own Website, acknowledges that Free Software licensing requires the release of at least some of Nucore under a Free Software license (hence, as a derivative work of QEMU – which is a prior Free Software work -- Nucore at least in part cannot be the subject of <u>exclusive</u> rights for BGP).  It remains to be seen whether <u>any</u> part of Nucore is actually exempt from the "give back" requirements of Free Software.  That is the central issue in this case.

Mr. Lipham is hardly the only person genuinely concerned about this issue.  For instance, one contributor to the pinball forum Pinside, had this to say:

> It seems that this lawsuit has generated quite a bit of chatter within our communities so I'll chime in.
>
> I am a QEMU developer (one of many).  I took the liberty of checking this "Nucore" thing out and prodding the file they make freely available for download.  For those who do not know QEMU is a popular open source hardware virtualization package.  It is used to make products like VirtualBox and KVM and is one of the largest competitors in that particular space.  We offer it free to everyone, but most importantly we offer it under the GPL family of open source licenses.
>
> It seems that "Nucore" is a derivative work of QEMU.  I say derivative because the call stack, string table and function signatures all contain identical code to the QEMU core.  The linking provisions in the LGPL do not apply here as you are modifying the system emulator and distributing those modifications.  If your product used our emulator by linking to it at run time via a shared library or invoking the stock QEMU system

emulation executable separately with the binary to be emulated, then you would not have to open source your product.

I also looked up the copyright registration filed earlier this year for "Nucore" and I see that "Steve Ellenoff" is one of the members on the registration which would make the following posts to our development email lists make sense.

http://qemu.11.n7.nabble.com/template/NamlServlet.jtp?macro=user_nodes&user=1660

After looking at the hardware aspects of the 486 emulation and the MediaGX chipset that was used in these products these questions make sense that they would apply to "Nucore" as well.

We're trying to figure out what to do with this. We encourage people to adopt and use our software but they must do so under the terms of our license. It is also a "copyleft" license. This means that you must extend to the recipients of your software (in this case everyone who can download a copy) the same rights and distribution privileges as we granted to you under the (L)GPL. If you use later versions of QEMU then they are subject to GPL.

If you are distributing a derivative of my (and others) work without complying with the software license, that constitutes copyright infringement. This would apply to any copies distributed without a copy of the license and the corresponding source code used to make your executable. We want you to feel free to use open source works, but you must share and share alike. We do not see the source code posted on your site. I have also checked with the other QEMU developers and nobody has granted an alternative license for Nucore. So we hope that when it is said that Nucore was about to be released that it was also meant that it would be done in a way that does not constitute infringement upon our license.

I do not have any contact information for the Nucore team but feel free to contact us at qemu-dev at member[dot]fsf[dot]org if there are any licensing questions or view the "License" link on our web site.

< https://pinside.com/pinball/forum/topic/nucore?tu=deefunkt >.

Obviously, BGP cannot and should not be the judge in its own case, or appoint itself to determine in secret what BGP is obligated to share on a non-exclusive basis, and what (if anything) BGP may exclude others from seeing. What is required is at least one set (and perhaps a handful

3

of sets) of reliable and technically astute eyes to perform an independent code review – much like the one that was performed in the SCO litigation, when SCO alleged (and lost) that the GNU/Linux operating system purportedly infringed UNIX.

The Software Freedom Conservancy presently is involved in litigation in Germany against a company called VMWare. The plaintiff in that case is not Linus Torvalds (the project leader for Linux), but one of the contributors to the Linux kernel, who submitted much of the code that VMWare allegedly infringed. In that case, the Software Freedom Conservancy is taking the legal position – as a matter of principle – that the code review of VMWare for infringement must take place without any protective order (in other, words, out in public).

Mr. Lipham has the luxury of taking a more pragmatic approach, and would not be at risk of taking inconsistent positions in multiple lawsuits, if Mr. Lipham were to agree with a protective order, at least while code review is taking place. In this sense, it is probably advantageous for the Software Freedom Conservancy not to intervene, either on its own or on behalf of the QEMU member project community, at this particular time.

Additionally, although the non-involvement of SFC (and through SFC representation, the QEMU contributors who wrote the code) benefits BGP in the sense that BGP does not face monetary exposure under the Copyright Act unless and until SFC and the QEMU project intervene, this neutral posture by the SFC does present an opportunity to address a legal issue about "crowdsourcing" some aspects of Free Software compliance. When counsel for Mr. Lipham identified this issue as a "novel" issue, that was not to suggest in any way that we just dreamed it up out of the blue. Rather, Free Software issues do not get litigated very often; generally, they get resolved out of court. Merely because a court has not previously decided whether someone in the position of Mr. Lipham can assert Free Software licensing requirements as an affirmative defense,

does not mean that this argument is not solidly grounded in the text and intent of the applicable copyright law and licenses. Nor does it mean that the concept has not been thought through with some care. What it means is simply that the occasion has not yet arisen to present this unsurprising and entirely reasonable theory to a court before in a prior case. And that is hardly unexpected, because generally these kinds of cases get resolved short of federal court litigation.

The decision actually to initiate a lawsuit by the team of developers for a Fee Software project (such as the one in Germany against VMWare) presents a rather significant coordination problem. It is not just the "maintainer," or project leader of a Free Software project – for instance, Mr. Torvalds for the Linux kernel – who owns the copyright. Rather, buy-in for taking enforcement action, can sometimes involve multiple contributors, each of whom have helped write the copyrighted work, depending on the particular project. For Linux, this could literally mean thousands of potential decision-makers to be consulted.

The intent of the GPL and the LGPL to confer a benefit (the "four freedoms" of Free Software – including the right to view the entire source code of the program and all derivatives), upon people other than the licensor – namely, upon the entire community of end-users -- is clear on the face of the licensing documents. Accordingly, it only makes logical sense that, while any community member may not affirmatively sue for damages or seek to enjoin distribution of an infringing work, some rights do extend to anyone in the community. In other words, anyone in the community (whether or not a developer) <u>may</u> assert rights under the license up to and including what the license states is intended to be conveyed to each community member.

Accordingly, at this time, it would appear advantageous to have Mr. Lipham proceed on this legal theory, and to seek to make good law for the future – rather than to have the Software

5

Freedom Conservancy enter the fray, and escalate the risk to BGP by bringing money damages, attorney fees, and injunctive relief into the mix of issues present in this litigation.

One of the services that the Software Freedom Conservancy can provide (but does not necessarily provide in every case) is to become the assignee and holder of the copyright on a software project (such as the Linux kernel, or the QEMU emulator) that is approved for SFC membership.  However, such an assignment is not a mandatory precondition for SFC membership.

At this time, we have been advised by Tony Sebro and Bradley Kuhn of the SFC, that a Fiscal Sponsorship Agreement is in place between the SFC and a host of contributors to the QEMU project.  Joining the SFC means, among other things, that a steering committee has been formed to decide on behalf of the QEMU community, what enforcement actions will be taken and when.

Such a Steering Committee streamlines the decision-making process, in relation to the bringing of copyright enforcement suits (say, potentially, suing BGP for damages and an injunction), but still results in a decision-making process that requires a fair amount of time and coordination. These decision-making processes do not occur overnight.

The copyright for QEMU does not belong to just one individual (just as the copyright to the Linux kernel does not belong just to Linus Torvalds, who heads the kernel development team). Rather, a multitude of contributors who have submitted code to the QEMU project.  Now that QEMU is a member project of the SFC, decisions about litigation (if any) are run through a steering committee, rather than being decided through a more-or-less ad-hoc process involving a large number of contributors.

When Mr. Lipham and his legal counsel reached out to the SFC, we did mention (as Mr. Farr, the lawyer for BGP had requested), that BGP also would like to communicate with the SFC and with the Steering Committee of the QEMU project.  In addition to securing some clarification

about who owns the QEMU copyright (alas, the ownership is distributed, and decision-making about affirmatively asserting rights remains somewhat unwieldy), Messrs. Grimm and Lipham also scheduled a conference call with the general counsel and president, to be held on August 11, 2015.

The day before the conference call, we were contacted by the General Counsel for the SFC with the following email:

> Hello, all.
>
> We are sorry that we must cancel our call for tomorrow. After conferring with our litigation counsel, we've decided not to have any bilateral conversations with either party in this litigation. We will continue to monitor the docket of this litigation and determine what course of action (if any) we need to take to represent the interests of Conservancy's QEMU project.
>
> Best,
>
> -Tony Sebro

In other words, depending on what happens as this case moves forward, the SFC may potentially choose to get involved. Or it may not. But both the QEMU project, and the SFC, will do it on their own timetable, and without coordinating in advance with any of the existing litigants.

Needless to say, in the view of Mr. Lipham, a swift resolution would seem more likely if the QEMU project were to place BGP at immediate risk of large damages and an injunction. However, we do not see it as having any impact on the merits of the case, for SFC and/or the QEMU contributors to choose (at least for the present) not to intervene.

7

The whole point of the GPL and the LGPL is that once software is released under one of these licenses, then somebody like Mr. Lipham **does not have to ask permission** of Fabrice Bellard, of any of the QEMU contributors, or anyone else, in order to enjoy each and all of the Four Freedoms.  And what Mr. Lipham is accused by BGP of doing, is nothing other than exercising the exact four freedoms that Mr. Lipham is supposed to enjoy under copyright law and the applicable licenses, without requiring anybody's permission (including any permission of BGP).

So, to get back to where this status report started, Mr. Lipham is of the view that the most efficient way to resolve this case, is to commence a code review at the earliest possible opportunity, and to secure an objective, reliable, determination as to what parts of "Nucore" are subject to Free Software "give back" requirements, and which (if any at all) are exempt.

We fully support the idea of bringing in specialized expertise, to assist with the issues in this case.  At least three good candidates come to mind, all of whom are busy, but each of whom is knowledgeable about, and expert in, this particular field.

First would be Professor Lawrence Lessig of Harvard Law School, the author of FREE CULTURE (among other books), and one of the founders of the Creative Commons project. Professor Lessig presently is mulling a run for President of the United States, at least according to the August 24, 2015 issue of Time Magazine.  < http://time.com/4008492/lawrence-lessig-president-bernie-sanders/ >.  His time availability may be limited, but he obviously possesses the right technological and legal background.

Second would be Molly S. Van Houweling, a professor and Associate Dean at U.C. Berkeley Law School.  < https://www.law.berkeley.edu/php-programs/faculty/facultyProfile.php?facID=5073 >.  Professor Van Houweling, in addition to

setting speed records on the bicycle recently, was one of the principal authors of the Creative Commons license, and has been steeped in Free Software and Free Culture issues, since the time she spent as a student at Harvard's Berkman Center for Internet and Society. She taught for a time at University of Michigan Law School, in Ann Arbor.

If it is possible to get some of his scarce time, a third choice worth considering would be NYU Law Professor Eben Moglen, who headed the international drafting process for the GNU General Public License, version 3, and who served for many years as the General Counsel for the Free Software Foundation. Nobody has more detailed and nuanced familiarity with the kinds of issues presented in this case, than Professor Moglen.

Any one of these three would already hit the ground running, at the top of the learning-curve, when it comes to "copyleft" issues, rather than requiring an extensive read-in period in order to get up to speed (as would be the case with typical copyright lawyers).

We thank this honorable Court for its attention to these matters.

Respectfully submitted,

August 25, 2015

s/ Eric C. Grimm (P58990)
ERIC C. GRIMM, PLLC
Attorney for Defendant
1330 West Summit Avenue
P.O. Box 41
Muskegon, MI 49443-0041
734.717.4900
Email: ecgrimm@umich.edu

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BIG GUY'S PINBALL, LLC,

    Plaintiff,

v.

JIMMY LIPHAM,

    Defendant.

Case No. 2:14-CV-14185-VAR-RSW

Honorable VICTORIA A. ROBERTS
U.S. District Judge, Presiding

Honorable R. STEVEN WHALEN
U.S. Magistrate Judge, Referral

_____/

| Robert A. Farr, Jr. | Eric C. Grimm (P58990) |
| ROBERT A. FARR, PLLC | ERIC C. GRIMM, PLLC |
| Attorney for Plaintiff | Attorney for Defendant |
| 1050 Shiawassee Circle | 1330 West Summit Avenue |
| Howell, MI 48843 | P.O. Box 41 |
| 248-703-0662 | Muskegon, MI 49443-0041 |
| Email: rfarr@rfarrlaw.com | 734.717.4900 |
|  | Fax: 888.502.1291 |
|  | Email: ecgrimm@umich.edu |

_____/

CERTIFICATE OF SERVICE

    Eric Grimm (P58990), attorney for Defendant, certifies that on August 25, 2015, I filed the foregoing Status Report, with the Court via the ECF system, which will provide notice and service of such documents upon all parties by their counsel of record.

                                  ERIC C. GRIMM, PLLC

                          By:    s/ Eric C. Grimm (P58990)
                                  Attorney for Defendant
                                  1330 West Summit Avenue
                                  P.O. Box 41
                                  Muskegon, MI 49443-0041
                                  734.717.4900
                                  Email: ecgrimm@umich.edu